IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                   Cr. No. 25-20293-SHL

BRANDON BROWNLEE, II

      Defendant.

---

**MOTION TO SUPPRESS
AND INCORPORATED
MEMORANDUM OF LAW IN SUPPORT**

---

COMES NOW, Brandon Brownlee, II, by and through his appointed counsel of record, Needum L. Germany, Assistant Federal Defender, pursuant to Federal Rule of Criminal Procedure 12(b)(3), and for his Motion to Suppress, states as follows:

## I.    <u>INTRODUCTION</u>

The following information was obtained from documents produced in discovery, Tennessee Highway Patrol ("THP") Trooper Ashton Cotner's body worn camera ("BWC") footage, and the dashboard camera footage from Trooper Cotner's THP patrol car.

While patrolling on Lamar Avenue near Shelley Street, Trooper Cotner observed Mr. Brownlee walking on the sidewalk wearing a lime green sling-style bag across his chest. As he drove past Mr. Brownlee, Trooper Cotner allegedly observed him clutch the bag and watch his THP vehicle. Trooper Cotner and another large black SUV made a u-turn. Trooper Cotner alleges that he initially wanted to make voluntary contact.

As the black SUV and Trooper Cotner approached Mr. Brownlee, he was crossing the street. This part of Lamar has two lanes going east and two lanes going west, with a middle turn lane—effectively five lanes in total. Mr. Brownlee slowed in the middle turn lane when he saw the black SUV and Trooper Cotner approaching to allow them to pass. The black SUV slowed down to an exceeding slow speed and so did Tropper Cotner. It appears the occupants of the black SUV waved for Mr. Brownlee to go ahead and finish walking across the street. Mr. Brownlee is seen jogging across the westbound lanes and then slowing when he reaches the sidewalk.

Trooper Cotner initiated his blue lights, sped around the black SUV, and stopped Mr. Brownlee for jaywalking. As Trooper Cotner pulled up behind and beside Mr. Brownlee for the stop, a large black pick-up truck also pulled up in front of Mr. Brownlee, blocking his egress. Four officers wearing vests labeled police, quickly jumped out of the pick-up and approached Mr. Brownlee. The large black SUV with its lights flashing stopped behind Trooper Cotner's THP vehicle. At least one other officer, with a vest also labeled police, exited the SUV.

Mr. Brownlee put up his hands and Trooper Cotner immediately handcuffed him. As he was being handcuffed, Trooper Cotner asked Mr. Brownlee if he had a gun in the bag. Mr. Brownlee responded "yes," and also admitted that he was not supposed to have a weapon. One of the officers cut the bag off of Mr. Brownlee while he was handcuffed. The officers indeed found the firearm at issue in this case inside the bag.

Upon review of BWC footage, it was determined that Trooper Cotner stopped Mr. Brownlee in the vicinity of 2657 Lamar Avenue.

## II.   ARGUMENTS AND AUTHORITIES

The Fourth Amendment to the U.S. Constitution guarantees people the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment's requirement that searches and seizures be founded upon an objective

justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.  See United States v. Mendenhall, 446 U.S. 544, 551 (1980).

There are three types of permissible encounters between the police and citizens: (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.  United States v. Gross, 662 F.3d 393, 398 (6th Cir. 2011).  Based upon the discovery and BWC footage, this was a consensual encounter that ripened into an investigative detention, commonly referred to as a Terry stop.  See Terry v. Ohio, 392 U.S. 1 (1968).

The reasonableness of police conduct in effectuating a stop is reviewed under the principles set forth in Terry.  See United States v. Hill, 195 F.3d 258, 263-64 (6th Cir. 1999), cert. denied, 528 U.S. 1176 (2000).  In evaluating the constitutionality of a Terry stop, courts engage in a two-part analysis of the reasonableness of the stop.  First, it must be determined whether there was a proper basis for the stop.  United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation marks omitted).  If the stop was proper, the courts next determine "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."  Id. (emphasis added) (internal omissions and quotation marks omitted).

**A.     There was no proper basis for the stop.**

In this case, Trooper Cotner alleges that he initially wanted to have a consensual encounter with Mr. Brownlee.  The trooper, however, witnessed Mr. Brownlee cross Lamar Avenue outside of a crosswalk and determined he was jaywalking, so the stop was not consensual, but instead… an outright seizure without probable cause.

3

The problem here is that Mr. Brownlee was not violating the jaywalking laws. The Memphis City Code provides in relevant part:

A. Between adjacent intersections at which traffic-control signals are in operation, pedestrians shall not cross at any place except in a marked crosswalk.

B. Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway.

Memphis City Code § 11-28-4(A), (B).

The state statute governing jaywalking similarly provides:

(a) Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway . . .

(c) Between adjacent intersections at which traffic-control signals are in operation pedestrians shall not cross at any place except in a marked crosswalk.

T.C.A. § 55-8-135(a), (c).

The BWC footage reveals that Mr. Brownlee was not between adjacent intersections with operational traffic-control signals, nor was he near one. He was not near a crosswalk.

Further, when he crossed the roadway, he yielded the right-of-way to all vehicles. He even tried to yield to Trooper Cotner and the SUV, but they slowed and signaled for him to cross. This provision does not literally apply whenever a pedestrian knows or has reason to know that a vehicle is on the roadway, however distant from the point at which he was attempting to cross. See DeRossett v. Malone, 239 S.W.2d 366, 467 (Tenn. Ct. App. 1950). Instead, it means "no more than that such a crossing pedestrian must yield the right-of-way whenever ordinary care requires that he do so in order to avoid a collision with an approaching vehicle." Id. Mr. Brownlee did so here—he slowed to yield to the police vehicles, then quickly crossed the road and did not block traffic when they signaled for him to finish crossing.

4

Consequently, Trooper Cotner had no reasonable, articulable suspicion of criminal activity supporting an investigative detention. The stop was not a proper stop. Mr. Brownlee was targeted simply because he was a black man wearing a bag. This is not surprising. The 2024 United States Department of Justice pattern and practice investigation of the Memphis Police Department ("MPD") found that MPD conducts unlawful stops, searches and arrests, and unlawfully discriminates against Black people when enforcing the law. See Press Release, U.S. Dept. Justice, Justice Department Finds Civil Rights Violations by Memphis Police Department and City of Memphis (Dec. 4, 2024).[1] These practices have only gotten worse with the military and other law enforcement additions to the Safe Streets Task Force. Mr. Brownlee thus respectfully requests this Court to suppress the firearm found in his bag and his statements of admission regarding the same.

**B.** **Trooper Cotner also violated Mr. Brownlee's Fifth Amendment right against self-incrimination when he interrogated him while he was in custody.**

Law enforcement officials are required to advise a person of their Miranda rights before engaging in "custodial interrogation." See Miranda v. Arizona, 384 U.S. 436, 444–45 (1966). A suspect is in custody for Miranda purposes when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). The Miranda test requires an examination of: (1) the totality of the circumstances surrounding the limitations on the suspect's freedom, see Thompson v. Keohane, 516 U.S. 99, 112 (1995); Berkemer, 468 U.S. at 437–38; and (2) what a reasonable person in the suspect's position would have thought about his freedom to leave

---

[1] Available at: https://www.justice.gov/archives/opa/pr/justice-department-finds-civil-rights-violations-memphis-police-department-and-city-memphis

knowing the facts available to him, see Thompson, 516 U.S. at 112; Stansbury v. California, 511 U.S. 318, 323 (1994).

There are four, non-exhaustive factors to consider in determining whether an individual is in custody: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions. United States v. Luck, 852 F.3d 615, 621 (6th Cir. 2017) (quoting United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010)).

Looking to the relevant factors, first, the location of the interrogation was on the side of the road in contrast to Mr. Brownlee's home. The home is generally viewed as a non-custodial setting. See Coomer v. Yukins, 533 F.3d 477, 487 (6th Cir. 2008) ("While an interrogation in one's home is not determinative alone of the custodial inquiry, it is usually indicative of the absence of the isolation inherent in custodial interrogations.") Here, the factors that turn the home, "an inherently comfortable and familiar environment," were not present. United States v. Panak, 552 F.3d 462, 466 (6th Cir. 2009). Miranda's special safeguards were required in this case because Mr. Brownlee was subject to "incommunicado interrogation . . . in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." Miranda 384 U.S. at 445.

Second, as to the length and manner of the questioning, it was quick and surprising. While handcuffing Mr. Brownlee, Trooper Cotner asked whether he had a gun and if he was a felon. Though being handcuffed is not dispositive of the custody inquiry, particularly where officer safety is at issue, "[b]eing placed in handcuffs . . . is a restraint associated with formal arrest and is often a key in determining if a suspect is in custody." United States v. Hemphill, No. 1:10–CR–053, 2010 WL 3366137, *4 (S.D. Ohio Aug. 20, 2010) (quoting United States v. Newton, 181 F.

Supp.2d 157, 174-175 (E.D. N.Y. 2002)); see also Hinojosa, 606 F.3d at 883-884 (absence of handcuffs was a significant factor in determining that the suspect was not in custody).

As to the third factor, whether there was any restraint on Mr. Brownlee's freedom of movement, there most certainly was. Trooper Cotner pulled up next to Mr. Brownlee with a large black SUV behind him containing at least one other officer. Meanwhile a large dark pick-up truck pulled up in front of Mr. Brownlee and several officers jumped out. Mr. Brownlee was immediately handcuffed. The Sixth Circuit has observed that a large "number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the [threatening or coercive] nature of the questioning," can turn even "an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." Panak, 552 F.3d at 466. That is what occurred in this case. Mr. Brownlee's freedom of action was curtailed to a degree associated with formal arrest. His bag was unnecessarily cut off of him. No reasonable person in his shoes would believe that he was free to leave.

Finally, Mr. Brownlee was not advised that he was not under arrest and in fact, was arrested almost immediately. See United States v. Swanson, 341 F.3d 524, 530 (6th Cir. 2003) ("[m]ost important to our analysis, though, is that [the defendant] was explicitly told by [the law enforcement agent] that he was not under arrest and that he did not have to speak with him if he did not choose to").

These factors weigh in favor of a finding that Miranda warnings were required because Mr. Brownlee was in custody at the time of the questioning. Because Miranda warnings were not given prior to questioning, Mr. Brownlee's Fifth Amendment rights were violated requiring suppression of the firearm and his statements of admission.

**C.**      **The good faith exclusion to the warrant requirement does not apply.**

The Supreme Court has recognized that the exclusionary rule should be used sparingly, only where it "results in appreciable deterrence." United States v. Herring, 555 U.S. 135, 141 (2009) (quoting United States v. Leon, 468 U.S. 897, 909 (1984)).  This is because the principal cost of applying the rule is letting guilty and possibly dangerous defendants go free. Id.  The focus is, therefore, on the efficacy of the rule in deterring future Fourth Amendment violations, and therefore the benefits of deterrence must outweigh the costs. Id.   The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct. Id. at 143.  Hence, to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. Id. at 144.  The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. Id.

For instance, in Herring, the defendant was arrested on a recalled arrest warrant.  The Court concluded that an error in failing to update a computer database to reflect the recall of the arrest warrant was negligent and that negligent error was not enough, by itself, to require the extreme sanction of exclusion under the Fourth Amendment.  The conduct in Herring did not rise to this level because the miscommunications were not routine or widespread; and they were not so objectively culpable as to require exclusion. Id.  Noting that the good-faith inquiry had always been confined to the question of whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances, the Court concluded that the record keeping error in issue was not so objectively culpable as to require exclusion. Id. at 145-46 (citing Leon, 468 U.S. at 922 n.23).  On the other hand, the Court noted that, had the police been shown to be reckless in maintaining the warrant system, or to have knowingly made false entries to lay

8

the groundwork for future false arrests, exclusion would certainly be justified should such misconduct cause a Fourth Amendment violation.  Id. at 146.

In this case, Trooper Cotner's conduct was deliberate and must be presumed recurrent.  He made the stop because he did not know the law.  Officers are presumed to have a reasonable knowledge of what the law prohibits.  See United States v. Rarick, 636 F. App'x 911, 918 (6th Cir. 2016) (citing Leon, 468 U.S. 897, 919 n.20 (1984)).  Trooper Cotner did not.  On the other hand, he must know that he cannot interrogate a suspect in custody without first advising that suspect of his Miranda rights.  Yet, he failed to do so with Mr. Brownlee.  For these reasons, Mr. Brownless respectfully requests that the Court suppress all of the evidence resulting from the stop.

## III.    CONCLUSION

The totality of the circumstances in this case indicate that the stop was illegal.  This illegality was exacerbated when Trooper Cotner violated Mr. Brownlee's rights by interrogating him while in custody without the benefit of Miranda warnings.  All of the evidence obtained as a result of the stop must therefore be suppressed.

WHEREFORE, for all of the foregoing reasons, Mr. Brownlee respectfully requests this Court to suppress all of the evidence resulting from his illegal stop.

Respectfully submitted,

TYRONE J. PAYLOR
FEDERAL DEFENDER

s/ NEEDUM L. GERMANY
Assistant Federal Defender
200 Jefferson Avenue, Suite 200
Memphis, TN 38103
(901) 544-3895

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing Motion to Suppress And Incorporated Memorandum of Law in Support was forwarded by electronic means via the Court's electronic filing system to Ms. Wendy Caceres, Assistant U.S. Attorney, 167 N. Main, Suite 800, Memphis, TN 38103, this 16th day of January 2026.

s/ NEEDUM L. GERMANY
Assistant Federal Defender