**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 25-20293-SHL** |
| | ) | |
| **BRANDON BROWNLEE II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SUPPRESS

Comes now the United States, by and through D. Michael Dunavant, United States Attorney for the Western District of Tennessee, and William Bateman, Assistant United States Attorney, and in response to Defendant Brandon Brownlee's ("the Defendant's") Motion to Suppress would state to the Court that:

## INTRODUCTION

On October 11, 2025, Tennessee Highway Patrol Trooper ("THP") Cotner, while patrolling in the vicinity of Lamar and Shelley, which he knew to be a high crime area, observed the Defendant walking while carrying a green crossbody bag across the front of his body. Trooper Cotner observed that the Defendant, upon seeing the THP cruiser, clutched the crossbody bag and stared at the THP vehicle as it passed him.[1] Based on his training and experience, Trooper Cotner had reasonable suspicion that the Defendant was unlawfully carrying a firearm in the bag. Trooper Cotner made a U-turn to make a

---

1 Undersigned counsel will deliver a disc with the body and dash cam video referenced herein to chambers as soon as the Federal Building is reopened. Defense Counsel is in possession of the video.

consensual contact with the Defendant based on this suspicion, when he then observed the Defendant changing his direction of travel by crossing five lanes of traffic on Lamar and impeding traffic. Trooper Cotner and other members of the Memphis Safe Task Force ("MSTF") then stopped the Defendant for jaywalking. Because of the reasonable suspicion that (1) the Defendant was unlawfully possessing a firearm and (2) had jaywalked, Trooper Cotner initiated a *Terry* stop. During the stop but before the Defendant was arrested or handcuffed, Trooper Cotner asked the Defendant if he was armed, to which the Defendant answered affirmatively, and Trooper Cotner recovered a firearm from the crossbody bag. A criminal history report was run on the Defendant, and it showed a prior felony conviction. The Defendant was arrested for being a felon in possession of a firearm.

The government will not use any statements at trial after the Defendant was placed in handcuffs. The Defendant was placed in handcuffs after he stated that he had a gun. As a result, the Defendant's motion to suppress any subsequent statements is moot.

The Defendant filed a Motion to Suppress seeking suppression of the evidence seized during the investigative stop, contending that the officer in this case unlawfully stopped the Defendant and violated his Fifth Amendment right against self-incrimination. *See* Motion to Suppress, RE-33. The United States submits that for the authorities and reasons set forth herein, the Defendant's motion is not well taken and should be denied.

**FACTS**

On October 11, 2025, at 1:06 pm, MSTF Officers were patrolling Lamar Avenue near Shelley Street. Shelley Street runs north and south and intersects Lamar Avenue, which runs in a southeasterly and northwesterly direction. Lamar Avenue, which is also

State Route 4 and U.S. 78, is a wide street and accommodates five lanes of traffic with the middle lane as the turning lane marked by yellow solid lines.[2] These are public highways maintained by the City of Memphis.




Map view of Lamar Ave. and Shelley St. intersection

While patrolling in a marked unit west bound on Lamar Avenue near Shelley Street, Trooper Cotner observed the Defendant, later identified as Brandon Brownlee, walking on the sidewalk east bound wearing a lime green sling-style bag across his abdomen. Trooper Cotner was aware the neighborhood was a high-crime area. Upon passing the Defendant, Trooper Cotner observed the Defendant clutch the bag and watch his patrol vehicle as they passed each other.

2 "Lamar Avenue (State Route 4, US 78) is a heavily traveled corridor beginning southeast of downtown Memphis and running to the Mississippi state line in Shelby County." https://www.tn.gov/tdot/projects/region-4/lamar-avenue.html (last accessed January 28, 2026, 2:12 pm central time)




View of the Defendant clutching green bag from THP vehicle

Trooper Cotner then turned around to make a consensual contact with the Defendant. After the U-turn, upon approaching the defendant, Trooper Cotner observed the Defendant cross five lanes of roadways from the north side of Lamar Avenue to the opposite side. Trooper Cotner and another MSTF vehicle had to slow down to allow the Defendant to cross. See frames below:









Trooper Cotner activated his blue lights and stopped the Defendant on the sidewalk in the 2600 block of Lamar Avenue. As Trooper Cotner pulled up beside the Defendant, fellow task force officers, arriving in two unmarked police vehicles, assisted in the stop. Trooper Cotner asked the Defendant if there was a gun in the crossbody bag. The Defendant replied that there was. The firearm was a loaded (round in the chamber and a filled magazine) Sarsilmaz SAR 9, 9mm pistol, S/N: T1102-21BV67801. Contrary

to what the Defendant provides in his motion, at the time Trooper Cotner asked the question and the Defendant responded, the Defendant was not under arrest or in handcuffs and no officer was within arm's reach of him.

**Body-worn Camera Footage**

The following is a summary of the footage from the body-worn camera of Trooper Cotner.

| Approximate Time Stamp Axon_Body_4_Video (Cotner BWC) | Event |
|---|---|
| 00:03 Cotner BWC 00:05 Cotner Dashcam | Trooper Cotner (Cotner) passes the Defendant who is clutching his lime-green bag and maintaining eye contact with the THP vehicle even after it passes |
| 00:18 Cotner BWC | Cotner makes a U-turn to make contact with the Defendant |
| 00:31 Cotner BWC | Cotner radios that he's making a voluntary contact with the Defendant |
| 00:35 Cotner Dashcam | The Defendant starts crossing the roadways |
| 00:34 Cotner BWC | Radio transmission states that the Defendant is crossing street |
| 00:47 Cotner BWC | The Defendant crosses to the south side of Lamar |
| 00:51 Cotner BWC | Cotner pulls up to the Defendant and points at him |
| 00:54 Cotner BWC | Cotner gets out and states to the Defendant, "Come here for a minute. Step over there. You doing OK? Come here. Stand still." Another agent comes into view approaching the Defendant from the other side. |
| 01:01 Cotner BWC | Cotner asks the Defendant, "You got a gun in that bag?" |
| 01:02 Cotner BWC | The Defendant, "Yeah, I got a gun—"[3] |
| 01:03 Cotner BWC | Cotner, "OK. Turn around and put your hands behind your back real quick. I can tell by the way you're carrying, OK?" Cotner controls the Defendant's hands behind his back. The Defendant replies, "No, I was, I was –" |

[3] The government will not introduce the statements of the Defendant after this statement at trial.

Because the Defendant was previously convicted of a felony, a criminal complaint was issued for his being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The Defendant was subsequently indicted for the same offense. He claims his Fourth Amendment rights were violated by an illegal stop and search and that his Fifth Amendment rights were violated by Trooper Cotner's questions.[4]

## APPLICABLE LAW

"Encounters between police offices and citizens can be grouped into three categories: "consensual encounters; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause."" *United States v. Campbell*, 486 F.3d 949, 953-54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)). Of relevance here is the *Terry* stop.

### ***Terry* Stop**

Law enforcement may briefly stop and detain an individual or car if they have reasonable suspicion of criminal activity. *United States v. Arvizu*, 534 U.S. 266 (2002); *Terry v. Ohio*, 392 U.S. 1 (1968).

Courts look at the "totality of the circumstances" of each case to determine whether reasonable suspicion exists. An officer must be able to articulate specific facts that gave rise to reasonable suspicion. This is low threshold. "… the likelihood of criminal activity need not rise to the level of probable cause, and it falls considerably short of satisfying a

[4] The Defendant also cites a 2024 Department of Justice investigation into the Memphis Police Department ("MPD") as proof of unlawful racial discrimination in the instant case. RE-33 at 5. Because no MPD were involved in the arrest, this argument misses the mark.

preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274. A stop may be based on a good-faith mistake of fact or law. *Heien v. North Carolina*, 135 S. Ct. 530 (2014).

The "totality of the circumstances" includes an officer's training and experience, presence in high crime area, which together with the facts and observations, might lead the officer to a conclusion that an untrained person would not reach. *Arvizu*, 534 U.S. at 273; *see also United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) ("The totality of the circumstances also involves common sense judgment and inferences about human behavior…as well as inferences the officer may draw based on his experience and specialized training.") (citations omitted). Even seemingly innocent or wholly lawful conduct can establish reasonable suspicion that criminal activity is afoot. *Arvizu*, 534 U.S. at 275. The courts must "take the facts together, framing an entire picture." *McCallister*, 39 F.4th at 374 (quoting *Arvizu*, 534 U.S. at 274 ("rejecting a divide-and-conquer analysis where a court concludes each individual fact is entitled to no weight because it is entitled to an innocent explanation."))

Related to *Terry* stop is a *Terry* frisk. If, during a *Terry* stop, an officer has reasonable suspicion that the individual is armed and dangerous, he or she may conduct a limited search of the individual for weapons. *McCallister*, 39 F.4th at 373. This is a pat-down of a suspect's outer clothing to discover weapons that the individual could use against the officer during a *Terry* stop.

There are two requirements for a *Terry* frisk: (1) the *Terry* stop leading to the frisk must be lawful; and (2) the officer must reasonably suspect that the person is presently armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323 (2009).

Moreover, "it is well established that safety concerns are an integral factor in the *Terry*-stop equation." *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008). During a *Terry* frisk "the officer may ask the detainee a moderate number of questions to…obtain information confirming or dispelling the officer's suspicions." *Id.* (quoting *United States v. Butler*, 223 F.3d 368 (6th Cir. 2000)). During this questioning, "the detainee is not obliged to respond…The very nature of the *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439-41 (1984)).

## ANALYSIS

### I. Trooper Cotner made a lawful *Terry* Stop and *Terry* Frisk.

Trooper Cotner made a lawful *Terry* stop because he had reasonable suspicion that the Defendant was (a) unlawfully carrying a firearm and (b) jaywalking. The reasonable suspicion regarding the unlawful possession of a firearm was based on the following observations: (1) the Defendant was clutching the crossbody bag as he passed the Trooper. (2) The Defendant continued to monitor Trooper Cotner's vehicle movement after they passed each other. (3) The Defendant changed his travel route and direction by cutting through five lanes of traffic upon seeing law enforcement. (4) Trooper Cotner's knowledge that the Defendant was in a high crime area.

The reasonable suspicion that the Defendant was jaywalking was based on the Defendant's crossing in front of two vehicles of oncoming traffic without ceding the right of way. The Defendant correctly cites the applicable Tennessee jaywalking statute. RE-

33 at 4 (citing T.C.A. § 55-8-135(a)).[5] In pertinent part it provides that a pedestrian not crossing in a marked crosswalk must yield the right-of-way to all vehicles. *Id.* The Defendant did not yield, and thus reasonable suspicion—and more—supported a finding of jaywalking. The Defendant's argument to the contrary, RE-33 at 4—based upon a dated Tennessee Court of Appeals decision which discussed a previous Memphis code ordinance—does not so neatly exonerate the Defendant as he provides. While it would be unreasonable to call a crossing in front of vehicles from a great distance a violation of the jaywalking statute, that is not what happened here. The Defendant crossed within two to three car-lengths in front of the MSTF vehicles, forcing them to "slow[] down to an exceeding slow speed." RE-33 at 2. There is no evidence that the occupants of the vehicles "waved Mr. Brownlee to go ahead and finish walking across the street." *Id.*

Based on the aforementioned, Trooper Cotner had the requisite reasonable suspicion to make a *Terry* stop.

Furthermore, Trooper Cotner was authorized to conduct a *Terry* frisk upon his suspicion that the Defendant had a firearm. *Campbell*, 549 F.3d at 372 ("It is well established that safety concerns are an integral factor in the *Terry*-stop equation…the officer may ask the detainee a moderate number of questions to…try to obtain information confirming or dispelling the officer's suspicions."). The analysis supporting the reasonable suspicion for the frisk is detailed above. Consistent with his suspicion and for officer and public safety, Trooper Cotner asked the Defendant within seconds of making contact with him whether he had a gun. The Defendant responded affirmatively. This additional fact provided further reasonable suspicion that allowed Trooper Cotner to frisk the Defendant.

---

5 Jaywalking is a Class C misdemeanor. *See* Tenn. Code Ann. § 55-8-103.

The Defendant, while arguably detained, was not in custody at the time, and thus no *Miranda* warnings were required. *See Swanson*, 341 F.3d at 528 ("The very nature of the *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights.").

**II. Trooper Cotner lawfully asked the Defendant if he had a weapon.**

The Defendant was not in custody when Trooper Cotner asked him if he had a weapon and thus no Fifth Amendment violation occurred. In determining whether a defendant was entitled to *Miranda* warnings "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Swanson*, 341 F.3d at 528 (quoting *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988)). There are four non-exhaustive factors to be considered in determining whether a Defendant was in custody: "(1) the location of the interview; (1) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (quoting *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)).

These factors weigh in favor of a finding that the Defendant was not in custody when he made his statement. First, the question and answer occurred outside, in public, on a major thoroughfare, where any potential police misconduct could be seen. *See Swanson*, 341 F.3d at 530 (citing *California v. Berkemer,* 468 U.S. 1121, 1125 (1983)). This weighs against a finding of custody. Second, the question and answer was immediate, brief (mere seconds), and to the point, not a prolonged interview. This too weighs heavily against a finding of custody. Third, at the time the question "you got a gun

in the bag," was asked, the only restraint on the Defendant's freedom was the presence of officers and Trooper Cotner's command to "step over there." The Defendant was not handcuffed and officers had not otherwise restrained him. This weighs against a finding of custody. *See Hinojosa*, 606 F.3d at 883. Fourth and finally, the Defendant was not told he did not need to answer questions. This would weigh in the Defendant's favor, but as previously discussed, an officer has a right to ask questions regarding his safety, like whether the Defendant has a weapon. The four factors weigh against a finding the Defendant was in custody.

**III. There is no deterrent value in suppression in the instant case.**

Suppression of the evidence here is not warranted. As noted by the Supreme Court, "suppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring v. United States*, 129 S. Ct. 695, 698 (2009). The Supreme Court went on to say that "exclusion 'has always been our last resort, not our first impulse.'" *Id.* at 700 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). It has "never [been] suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Id.* (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 368 (1998)). It has also been noted that "to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the 'substantial societal costs exacted by the exclusionary rule.'" *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).

The Defendant states that Trooper Cotner should have known the law and that he did not act in good faith by stopping the Defendant. RE-33 at 10. However, as discussed above, the Defendant jaywalked, and at the very least based on the frames provided above, Trooper Cotner had a good faith basis to believe the Defendant jaywalked. Moreover, as discussed above, Trooper Cotner had a reasonable suspicion the Defendant was unlawfully carrying a firearm. To suppress the evidence in this instance would not have the effect of deterring unlawful police behavior and thus the evidence should not be suppressed.

**IV. Discovery of the firearm was inevitable**.

Even if the Defendant's initial response to Trooper Cotner was to be suppressed, because Trooper Cotner had reasonable suspicion that the Defendant was armed and dangerous Trooper Cotner was entitled to perform a *Terry* frisk. The bodycam clearly shows Trooper Cotner frisking the Defendant between 1:50 and 2:05. The frisk, regardless of any response by the Defendant, would have inevitably led to the discovery of the firearm in the Defendant's bag.

**CONCLUSION**

Trooper Cotner had a reasonable suspicion that the Defendant was unlawfully possessing a firearm and jaywalking. Based on this suspicion, he lawfully conducted a *Terry* stop and asked the Defendant if he had a weapon to confirm his suspicion and for his safety. For the foregoing reasons, the Defendant's motion to suppress should be DENIED.

Respectfully submitted,

D. MICHAEL DUNAVANT
United States Attorney

By: s/*William Bateman*
William Bateman
Assistant United States Attorney
167 N. Main, Suite 800
Memphis, Tennessee 38103
Telephone: (901) 544-4231

**CERTIFICATE OF SERVICE**

I, William Bateman, Assistant United States Attorney for the Western District of Tennessee, hereby certify that a copy of the foregoing pleading was forwarded by electronic means via the court's electronic filing system to counsel for the defendant.

This date: January 30, 2026.

s/*William Bateman*
William Bateman
Assistant United States Attorney