**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:25-cr-20293-SHL |
| | ) | |
| BRANDON BROWNLEE II, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

No one in this matter involving a <u>Terry</u> stop by Memphis Safe Task Force ("MSTF") Officers can deny that labels can have utility. For instance, quick conclusions based on labels can help an officer make a wise split-second decision, or can cause a suspect to flee the scene of a crime. But labels involve generalizations. Because the Fourth Amendment explicitly shields all "persons" from warrantless seizures, generalizations about a person or place should be used "carefully," with "factual accuracy," lest they become, even unintentionally, "a proxy" for race, ethnicity, or socioeconomic class. <u>United States v. Beauchamp</u>, 659 F.3d 560, 570 (6th Cir. 2011).

Defendant Brandon Brownlee II invokes the Fourth Amendment's shield and seeks suppression of evidence obtained after he was descended upon by six MSTF Officers while walking alongside Lamar Avenue in Memphis, Tennessee in October 2025. (ECF No. 33.) The Government timely responded in opposition to the Motion and maintains that the entire encounter was constitutional. (ECF No. 35.) The Parties presented evidence and argument at a suppression hearing on March 5, 2026. (ECF No. 39.) Because Officers here violated Brownlee's Fourth Amendment right to be free from unreasonable seizure, the Motion is

**GRANTED**.

## BACKGROUND

The following facts are based on the undisputed allegations of the Parties, Trooper Cotner's Body-Worn Camera ("BWC") footage, Trooper Cotner's dashcam footage,[1] the Complaint (ECF No. 1), the Indictment (ECF No. 23), and Suppression Hearing testimony. The stop and search of Brownlee occurred on October 11, 2025. (ECF No. 35 at PageID 63.) That afternoon, MSTF officers in three separate vehicles patrolled the area of Lamar Avenue near its Shelley Street intersection. Lamar contains five lanes of traffic—two lanes in each direction, and a single turn lane in the center. One of the officers involved was Tennessee Highway Patrol Trooper Ashton Cotner. Trooper Cotner's patrol SUV was marked, while the other two vehicles, a truck and an SUV, were unmarked.

Around 1:06 p.m., Brownlee walked eastbound on the north side of Lamar, around 2657 Lamar. He wore jeans, a black t-shirt, and a lime green crossbody bag. The Officers drove past Brownlee in the right westbound lane; thus, Brownlee was on Cotner's right when Cotner drove past. According to the Government, Cotner was aware that "the neighborhood was a high-crime area," and he "observed [Brownlee] clutch the bag and watch his patrol vehicle as they passed each other." (ECF No. 35 at PageID 63.)

During the next thirteen seconds, Trooper Cotner testified that he watched Brownlee in his rear-view mirrors as Brownlee turned his head to watch Trooper Cotner continue down Lamar. According to Trooper Cotner, this action, combined with Brownlee walking in the area and clutching his bag, made him seem suspicious. Therefore, Trooper Cotner made a U-turn, having decided to approach Brownlee for a "consensual encounter."

---

[1] The videos from both sources are exhibits introduced at the Suppression Hearing.

Trooper Cotner radioed the officers in the two other vehicles to inform them that he would stop Brownlee, and they turned around to follow suit. Now heading eastbound, the three vehicles sought out Brownlee. They drove for ten more seconds and approached the area of Lamar where Brownlee then began crossing the road. The Officers radioed each other, pointing out Brownlee's crossing.

A black SUV driven by other officers was in the rightmost lane, several yards ahead of Trooper Cotner. Brownlee was visible in front of the vehicles at all times. Both vehicles slowed as they approached him. He entered the Lamar median, turning his head toward the vehicles. Cotner then waved at Brownlee to cross the road. (Cotner BWC ("Exhibit 1") at 00:00:35–37.) Brownlee crossed the median, paused, and lifted his right hand at the right-lane SUV. When the right-lane SUV rolled to a slower speed, Brownlee raised his right hand higher, toward the south side of Lamar, and jogged across the road. For the next six seconds, Brownlee continued walking eastbound alongside Lamar, facing away from the Officers.

The stop, arrest, and search happened fast. Trooper Cotner quickly pulled his car up beside Brownlee. He pointed at Brownlee and jumped out of his patrol vehicle. Brownlee froze. At the same time, the two other law enforcement vehicles pulled over, and five other Officers wearing tan vests marked "POLICE" exited those vehicles, and approached Brownlee. Trooper Cotner immediately began issuing commands as he exited, including "Come here for a minute. Step over there" (as he pointed at the sidewalk), and "Come here. Stand still." The commands continued as Cotner walked toward Brownlee and asked if he had a gun in his bag. Brownlee responded, "Yeah, I got a gun," so Trooper Cotner then took control of his arm, declaring "I can tell by the way you're carrying." (Exhibit 1 at 00:00:51–00:01:05.) The Officers held Brownlee in place while they cut the lime green bag off of him. They then searched the bag and recovered

a Sarsilmaz SAR9 9mm pistol from it.  (ECF Nos. 1-1 at PageID 4; 23 at PageID 33.)  Brownlee

admitted to Officers that he had a felony conviction.  (ECF No. 1-1 at PageID 4–5.)

Brownlee was subsequently indicted on November 6, 2025, for violation of 18 U.S.C. §

922(g)(1), being a felon in possession of a firearm.  (ECF No. 23.)  The instant Motion followed

on January 16, 2026, in which Brownlee challenges, on Fourth and Fifth Amendment grounds,

both the Terry stop and his non-Mirandized statement to Officers that he had a gun on his person.

(ECF No. 33.)  The Government responded in opposition on January 30.  (ECF No. 35.)

The Court held a Suppression Hearing on March 5, 2026.  Both Trooper Cotner and

Brownlee testified.  Trooper Cotner testified consistently with the events shown on his BWC and

dashcam video.  He stated that he made eye contact with Brownlee as he drove past him, and

watched him in the rearview mirror as Brownlee turned to watch the Officers' vehicles.  He also

averred that his suspicion that Brownlee might have a gun arose around the time that he made the

U-turn.  Trooper Cotner insisted that three facts contributed to that suspicion: Brownlee (1) was

walking in a high-crime area, (2) clutched his bag and watched the Officers' vehicles, and (3)

"created distance" between himself and the vehicles by crossing Lamar.  When asked by

Defendant if carrying a firearm was legal in Tennessee, Cotner responded that it is legal unless

an individual is prohibited from firearm possession.  Trooper Cotner did not know if the dark

SUV on the right, driven by other Officers, waved Brownlee across the road.

Brownlee testified after Trooper Cotner.  He stated that, on the day of the arrest, he was

walking alongside Lamar on his way to a job interview.  He stated that seeing the state trooper

vehicle did not make him clutch his bag—in fact, he contends that he did not clutch the bag.

Finally, he testified that the Officers slowed their vehicles and gave him small hand-waves

indicating that he could cross the road.  The Parties' arguments are considered in more detail

4

below.

## ANALYSIS

The Fourth Amendment to the United States Constitution protects "[t]he right of the people" against "unreasonable searches and seizures" by law enforcement that are unsupported by a valid warrant or probable cause.  U.S. Const., amend. IV.  Relevant here, the exclusionary rule protects one's Fourth Amendment rights by excluding from use in trial any evidence obtained in violation of those rights.  United States v. Moorehead, 912 F.3d 963, 967 (6th Cir. 2019).  However, several exceptions allow for warrantless seizures.

One exception is an investigatory, or Terry stop, of an individual, so an officer can confirm or deny a reasonable suspicion "that criminal activity has occurred or is about to occur." United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005); see United States v. Young, 707 F.3d 598, 605 (6th Cir. 2012).  To determine whether a Terry stop was constitutional, a court engages in a two-part inquiry.  First, a court "consider[s] 'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.'"  Beauchamp, 659 F.3d at 569 (quoting Davis, 430 F.3d at 354).  "[I]f the stop was proper," then a court determines whether the officer's subsequent conduct "was reasonably related in scope to the situation at hand."  Davis, 430 F.3d at 354.  The government bears the burden of proving that a seizure under Terry "satisfied the conditions of an investigative" stop.  See United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990).

As to the first prong, an officer must be aware of "specific and articulable" facts giving them a reasonable suspicion of past, present, or future criminal activity.  Beauchamp, 659 F.3d at 569; McPherson v. Kelsey, 125 F.3d 989, 993 (6th Cir. 1997) (quoting Terry v. Ohio, 392 U.S.

1, 21–22 (1968)).  A hunch is not enough.  Neither is abstract conjecture.  The facts must be particularized, that is, "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity."  United States v. Blair, 524 F.3d 740, 750 (6th Cir. 2008) (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).

Courts consider the totality of the circumstances when determining the propriety of a Terry stop.  United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002).  Circumstances that can support reasonable suspicion include an officer's training and experience, the amount of criminal activity in a geographic area, the time of day, and a defendant's behavior.  Id. at 397; Blair, 524 F.3d at 750; accord United States v. Patton, No. 15-20246, 2018 U.S. Dist. LEXIS 114543, at *18–19 (E.D. Mich. July 10, 2018).  These factors and the relevant evidence are scrutinized "using a common[-]sense approach."  United States v. Collazo, 818 F.3d 247, 257 (6th Cir. 2016) (quoting United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004)).

An area being high in crime, and behavior occurring at a certain time of day, typically at night, are facts that, alone, do not create reasonable suspicion.  Beauchamp, 659 F.3d at 570 ("These factors would apply to anyone who was in the [area at that time,] and so they 'should not be given undue weight.'" (quoting United States v. See, 574 F.3d 309, 314 (6th Cir. 2009)).  And although a person is entitled to (a) avoid law enforcement, (b) walk away from an officer, or (c) refuse to speak to them, nervous and evasive behaviors are relevant in the totality analysis.  See Family Serv. Ass'n ex rel. Coil v. Wells Township, 783 F.3d 600, 604 (6th Cir. 2015) ("Unsuspicious pedestrians remain free 'to ignore the police and go about [their] business.' Illinois v. Wardlow, 528 U.S. 119, 125 (2000).  And 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' Florida v. Bostick, 501 U.S. 429, 437 (1991)." (emphasis added)).

The Parties agree that the MSTF Officers executed a Terry stop, so the Fourth Amendment analysis begins with the validity of the stop.  The Government first argues that the stop was lawful because the Officers watched Brownlee jaywalk across Lamar "in front of two vehicles of oncoming traffic without ceding the right of way."  (ECF No. 35 at PageID 69–70.) The Government contends that Brownlee did not yield to the Officers, emphasizing his close physical proximity to the Officers' vehicles.  (Id. at PageID 70.)  It argued at the Suppression Hearing that, even if the Officers' conclusion about the jaywalking offense was incorrect, their belief about the offense was reasonable.

Second, the Government contends that Trooper Cotner had reasonable suspicion that Brownlee was unlawfully carrying a firearm because he was walking in a high-crime area, clutched his bag, watched the Officers as they passed, and "changed his travel route and direction by cutting through five lanes of traffic upon seeing law enforcement."  (ECF No. 35 at PageID 69.)  According to the Government, Trooper Cotner's training and experience in the relevant area around Lamar contributed to his belief that Brownlee's actions were suspect.

Brownlee challenges the entire stop and search.  First, he argues that the Officers lacked a reasonable suspicion that he violated Tennessee and Memphis jaywalking laws.  (ECF No. 33 at PageID 53.)  Specifically, Brownlee cites the Memphis City Code and the Tennessee Code, both of which require pedestrians crossing a roadway outside of a crosswalk to "yield the right-of-way to all vehicles" on the road.  Memphis City Code § 11-28-4(a); Tenn. Code Ann. § 55-8-135(a). Brownlee emphasizes that he "tried to yield to Trooper Cotner and the SUV, but they slowed and signaled for him to cross," so the Officers lacked a reasonable belief that a jaywalking offense occurred.  (ECF No. 33 at PageID 53.)

Second, Brownlee argues that the Officers lacked any other articulable basis to stop him

7

based on the other surrounding circumstances.  He avers that he "was targeted simply because he was a black man wearing a bag."  (Id. at PageID 54.)  At the hearing, he highlighted that the Officers viewed his inconspicuous conduct as suspicious.  He notes that clutching his cross-body bag, staring at the Officers, and walking in a high-crime area are all innocent actions that do not support a reasonable suspicion of being a felon in possession of a firearm, and, thus, he was wrongfully stopped.  In support, he partly relies on Trooper Cotner's testimony that he did not know or recognize Brownlee, or know that he was a convicted felon before the stop.

For several reasons, the Government has not met its burden of establishing reasonable suspicion for the stop.  First, Brownlee did not commit a jaywalking offense, and the Officers could not have reasonably believed so.  The applicable statute and ordinance required Brownlee to "yield the right-of-way to all vehicles upon the roadway."  Tenn. Code Ann. § 55-8-135(a); Memphis City Code § 11-28-4.B.  The uncontroverted video evidence depicts Brownlee crossing Lamar, slowing down in the median, and, after obtaining the vehicles' okay to continue, jogging to finish his crossing.  During Brownlee's crossing, Trooper Cotner waved him across the road with his left hand.  All of these events occurred while the Officers slowed their vehicles to a crawl.  Even if Brownlee did not completely stop in the median, neither Party has proven that he was required to.  All that Tennessee and Memphis law required of him was to yield to traffic, and he did so.  Although the Government emphasizes Brownlee's proximity to the vehicles, that fact is irrelevant to whether he jaywalked.

Even so, the proof showed that the Officers chose to apprehend Brownlee before he started crossing Lamar.  Thus, if anything, the Officers purposely approached Brownlee, and purposely slowed, which does not transform his otherwise innocent crossing of a public road, where he yielded, into a jaywalking offense.  Trooper Cotner confirmed as much when he

testified that he decided that Brownlee was suspicious enough to stop before he conducted the U-turn.  These facts support a finding that the Officers lacked a reasonable belief that a jaywalking offense occurred.

Additionally, the other circumstances, even considered together, do not raise a reasonable suspicion of criminal activity.  The circumstances relied on by the Government include (a) Trooper Cotner's knowledge from training and experience that this was a high-crime area, and Brownlee (b) walking in said area next to a public road, (c) during the day, (d) clutching a cross-body bag, and (e) watching the Officers' vehicles.

Training and experience are relevant, especially where an officer knows from their past work that an area faces more crime than others.  See United States v. McMullen, 103 F.4th 1225, 1231 (6th Cir. 2024) ("[T]he detectives relied on their training and experience to infer that McMullen was grasping for a weapon.  And that inference's reasonableness cannot be separated from contextual circumstances surrounding the stop.").  Trooper Cotner's testimony confirms the high-crime area factor, but that factor, alone, is not enough to establish reasonable suspicion.  United States v. Johnson, 620 F.3d 685, 692–93 (6th Cir. 2010).  And the importance of the high-crime area is diminished by the fact that this stop occurred in early afternoon, in daylight.  Cf. United States v. Caruthers, 458 F.3d 459, 467 (6th Cir. 2006) (explaining that presence in a "high-crime area" "late at night" can support a reasonable suspicion), overruled on other grounds by Cradler v. United States, 891 F.3d 659 (6th Cir. 2018).  Despite Trooper Cotner's training and experience around Lamar, which he repeatedly referenced without further explanation at the Suppression Hearing, other circumstances weigh against reasonable suspicion.

All of those other factors demonstrate innocuous conduct by Brownlee.  He walked next to a public road in the middle of the day and carried a lime-green bag, none of which is a

criminal activity.  See Papachristou v. City of Jacksonville, 405 U.S. 156, 163 (1972) (stating that a city ordinance that outlawed "nightwalking" had made an otherwise innocent and virtuous act illegal).  And although the Government argues that Brownlee changed his course to create space between him and the Officers, none of the evidence shows that he changed the direction that he was walking in to intentionally avoid them.  See Johnson, 620 F.3d at 694–95 (collecting cases discussing the pace and direction of a pedestrian's travel and describing a defendant's unchanged "trajectory" as unsuspicious).  Rather, Brownlee was walking east when first observed, as the Officers drove past him heading west, and then he crossed the street to continue walking east.  By the time he was crossing the street, he was approaching the Officers and they were approaching him, because they knew they wanted to stop him.  Although unclear that he did, even if Brownlee followed an avoidant path away from the Officers, he had a right to.  See Family Serv. Ass'n, 783 F.3d at 604 ("Walking away from an officer without answering his questions or revealing one's name does not establish reasonable suspicion for a Terry stop. . . . [W]alking without evident purpose remains an innocent . . . activity in this country, whether in a high-crime area or a suburban park.").  No other facts imply that his path of travel was suspicious—he continued walking eastbound at the same pace after crossing Lamar.

Moreover, the Parties dispute whether Brownlee clutched his bag.  Brownlee testified that he did not.  But even if he did clutch his bag, that action is open to several innocent interpretations, including the possibility that he was simply securing the crossbody bag strapped across his torso while cars drove by.  See Johnson, 620 F.3d at 695 ("[T]here was nothing suspicious about [defendant's] walk toward the white car, least of all the fact that he carried a bag.").  An attorney may clutch their briefcase while walking into a courthouse.  A tourist may clutch their purse while walking down Beale Street after sunset.  To say Brownlee's hand on his

10

bag was suspicious here "would be to contract dramatically the scope of the Fourth Amendment for all . . . those unfortunate enough to live in high-crime areas." Id.

What is more, looking at law enforcement is not suspicious, unless a suspect does it while engaging in other suspicious behavior. See United States v. Keith, 559 F.3d 499, 505–06 (6th Cir. 2009) ("[I]t is entirely to be expected that, out of curiosity, [suspect's] attention was drawn to the nearby police cars."); Dancy v. McGinley, 843 F.3d 93, 110 (2d Cir. 2016).

The proof shows that Trooper Cotner simply had a hunch, but hunches do not support reasonable suspicion. For example, the court in United States v. Patterson held an investigatory stop improper because the officers relied on two articulable facts for their suspicion: the defendant walked away from them when they approached in uniform and another individual in a crowd threw an object into bushes.[2]  340 F.3d 368, 369–70, 72 (6th Cir. 2003). As the Patterson court explained, "[i]t is possible for factors, although insufficient individually, to add up to a reasonable suspicion. . . . But we think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." Id. (quoting United States v. Smith, 263 F.3d 571, 593–94 (6th Cir. 2001)). The officers in Patterson had no concrete facts hinting at the defendant's criminal activity beyond some background knowledge that they were responding to a stale civilian complaint about Black men on a street corner in a neighborhood with a reputation as crime-ridden. Id. at 569–70. Those facts, combined with the defendant walking away, were not enough.

The Beauchamp court held similarly, when a defendant hurriedly walked away from an officer after being "noticed . . . with another individual" and being labeled by officers as a

_____

[2] Because the Patterson defendant was not the person who threw the object away, the court dismissed that fact in its reasonable suspicion analysis. Patterson, 340 F.3d at 372.

11

"suspicious subject." Beauchamp, 659 F.3d at 564 (citation modified). Noting that the defendant simply avoided eye contact with an officer, stood with another person outside, and walked around a high-crime area, that court explained that "[t]he ambiguity of [defendant's] conduct may be susceptible to many different interpretations, but that does not render it suspicious. An inquiry into reasonable suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity." Id. at 571. Moreover, unlike here, both stops in Patterson and Beauchamp occurred in the dark of night. Still, neither court found that particularized facts supported a reasonable suspicion.

The Court finds that the Officers here simply saw Brownlee walking outside, in the middle of the day, in a high-crime area, in the opposite direction, and assumed that him clutching his bag meant that he had a gun. That assumption was not tethered to a specific fact implying criminal conduct. Brownlee was not slinking around shadowed alleyways like the defendant in Pearce. United States v. Pearce, 531 F.3d 374, 377, 382–84 (6th Cir. 2008) (concluding that reasonable suspicion existed when a defendant "glance[d] towards [an officer], hunch[ed] over, place[d] his right hand in the small of his back," and backed away from the officer parked in the middle of the street at night). On the contrary, his conduct is open to various innocent interpretations, which cannot be combined to raise a reasonable suspicion about criminal activity merely because Trooper Cotner had experience in the neighborhood. This conclusion finds further support in the Government's lack of explanation about how clutching a bag and staring at police is suspicious. One can only wonder, what if Brownlee was simply adjusting his bag? Moreover, if Brownlee had instead looked away from the Officers, would his conduct have also been "evasive?" See Beauchamp, 659 F.3d at 571. Although the Officers suspected criminal activity, their suspicion was not reasonable, regardless of the correctness of their hunch.

Because the Officers here lacked specific, articulable facts contributing to a reasonable suspicion of Brownlee's criminal activity, they did not have a lawful basis for stopping him, and Brownlee's Motion is **GRANTED**.  Furthermore, because the Terry stop lacked reasonable suspicion, the remainder of the stop, conversation, and search "must be suppressed as the fruit of the poisonous tree."  See See, 574 F.3d at 314.  Thus, the Government's argument for denying the Motion based on the inevitable-discovery doctrine fails, (see ECF No. 35 at PageID 73), and the Court need not consider the arguments regarding alleged violation of Miranda v. Arizona, 384 U.S. 436 (1966).

For the reasons explained above, the Officers violated Brownlee's Fourth Amendment right to be free from unreasonable seizures.  Brownlee's Motion to Suppress is **GRANTED**. The Government may not use the firearm found on Brownlee's person or his statement at the scene of his seizure that he had a gun in its case-in-chief.

**IT IS SO ORDERED,** this 7th day of April, 2026.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

13